Filed 10/19/22

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078869 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD160193) |
| GERARDO JIMENEZ VIZCARRA, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Joan P. Weber, Judge.  Affirmed.

Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina, Lynne G. McGinnis, and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

# I

## INTRODUCTION

In 2001, Gerardo Vizcarra was convicted of the second degree murder of Richard Holcomb (Pen. Code, § 187, subd. (a)).[1] Vizcarra and three confederates beat, kicked, and stabbed Holcomb to death after he bumped a mutual companion's young child into a wall while playing with him.

In 2019, Vizcarra filed a petition to vacate his murder conviction and to be resentenced under section 1172.6 based on changes to our state's murder laws effectuated by Senate Bill No. 1437 (2017–2018 Reg. Sess.) (hereafter, Senate Bill 1437) and Senate Bill No. 775 (2020–2021 Reg. Sess.) (hereafter, Senate Bill 775).[2] The trial court denied the petition for resentencing, finding Vizcarra was not entitled to relief because he remained liable for Holcomb's murder under a still-valid theory of liability—to wit, he directly aided and abetted an implied malice murder.

Vizcarra appeals the order denying his petition for resentencing. He argues direct aiding and abetting of implied malice murder is not a legally-valid theory of murder liability. Further, he argues he is entitled to resentencing under Senate Bill No. 1393 (2017–2018 Reg. Sess.) (hereafter, Senate Bill 1393), which grants courts discretion to strike or dismiss prior serious felony enhancements in furtherance of justice.

We reject these arguments and affirm the order denying Vizcarra's petition for resentencing.

---

[1] Further undesignated statutory references are to the Penal Code.

[2] At the time Vizcarra filed his petition for resentencing, section 1170.95 governed the resentencing of murder convictions. Effective June 30, 2022, section 1170.95 was renumbered section 1172.6, with no change in text (Stats. 2022, ch. 58, § 10). For the sake of clarity, we will refer to the resentencing statute in its current renumbered form.

2

## II

## BACKGROUND

A. *Factual Background*

The following background comes from this court's opinion in *People v. Vizcarra* (Oct. 26, 2004, D041824) [nonpub. opn.] (hereafter, *Vizcarra I*).

"On the afternoon of May 6, 2001, Vizcarra, the victim Richard Holcomb, and John Hedderson were in the living room of Hedderson's house. (Vizcarra rented space in Hedderson's garage.) Holcomb and Hedderson had been drinking and using methamphetamine.

"At some point, Holcomb picked up Hedderson's five-year-old son and bumped him into a wall while walking or swinging him around. As soon as the boy hit the wall, Holcomb put him down. Vizcarra became angry and told Holcomb, 'You shouldn't have done that to a small child.' Vizcarra told Holcomb he was going to call some friends to 'take care of' Holcomb. Vizcarra described Holcomb as drunk, argumentative and getting 'in his face.'

"Vizcarra left the living room and made a phone call. Shortly thereafter three men arrived in a blue Mustang. One man said, 'Oh, that's my brother-in-law' as he walked through the front door. Vizcarra then grabbed Holcomb around the neck and dragged him into Hedderson's bedroom. The three men also went into the bedroom.

"Hedderson picked up his youngest son, carried him outside and then returned to the house. In the bedroom, he saw Holcomb, who appeared to have been beaten, partially rolled up inside the bedroom's rug. Holcomb was moaning. Vizcarra and three men had kicked, 'stomped,' and stabbed Holcomb. Vizcarra told Hedderson, 'Don't trip,' meaning Hedderson should not panic. One of the men said, 'Don't let the kids walk past this part of the house.' Hedderson responded, 'Don't worry. We're out of here.' He left with his sons.

3

"After Hedderson left, Vizcarra helped wrap Holcomb's body in a sheet from the bed, plastic garbage bags and the rug. He then helped move the body into the garage.

"About 4:00 p.m., Hedderson's sister arrived at the house because she was planning to take Hedderson's sons to a birthday party. The blue Mustang was still in the driveway. She knocked on the door and the window but received no response. Three men came from the back of the house, walked past her, got in the Mustang and drove away. She did not know any of the men nor was she able to later identify them. She walked to the back door and called out her brother's name. Vizcarra 'came from behind a wall and jumped out,' and told her Hedderson was not at home but would be back shortly. Vizcarra also told her he was getting ready to take a shower. Vizcarra was wearing a leather jacket but no shirt.

"After she left, Vizcarra asked to borrow a pair of pants from a homeless man living on a vacant lot next to Hedderson's house. The homeless man described Vizcarra as being 'hyped up' about something and having a knife in his hand. The homeless man gave Vizcarra a pair of pants. Vizcarra gave the homeless man his own pair of pants, telling him, 'bury them and bury them deep.' The homeless man did not remember seeing any blood on the pants but did notice they were damp.

"Vizcarra left the house to meet with some other people. They decided to burn Hedderson's house to cover up the murder. Vizcarra, 'Toker' (Saul Barrios), Twila Carroll and perhaps another person went to Hedderson's house. Vizcarra poured gasoline on the living room floor. About 5:00 a.m. on May 7, the house exploded. Vizcarra was burned in the fire.

"When the police responded to the fire, Hedderson's house was completely engulfed in flames. They found Holcomb's body in the garage. There were two plastic garbage bags over his head, and the body was wrapped in a sheet and rug from the bedroom.

"The autopsy revealed Holcomb had suffered a number of cutting wounds, including a fatal wound on his neck. He also had

4

a number of injuries that were consistent with being kicked or stomped, including a fatal head injury. Seven of Holcomb's ribs had been fractured in a 'roughly linear pattern, indicating some broad-surface type impact' such as a two-by-four or flat portion of a chair or table. The injuries were inflicted while Holcomb was still alive. At the time of his death, Holcomb had a blood alcohol level of .22 and had methamphetamine in his system.

"The forensic pathologist could not determine the order in which the injuries were inflicted. The neck wound probably would have resulted in Holcomb losing consciousness within 30 to 40 seconds due to a lack of blood to the brain but Holcomb might have continued to gasp for air and moan. Within five or ten minutes, depending upon the amount of Holcomb's physical exertion, he would have lost so much blood his heart would have started to beat irregularly.

"An arson expert testified the fire was deliberately set and gasoline was used as an accelerant. In the living room, there were two gasoline containers, a lighter and a gasoline soaked rag. One of the containers had a paint roller stuffed inside the opening, probably to be used as a wick so that when the roller was lit, the fire would go into the container and ignite the vapors. There was a lighter near this gasoline container. The explosion probably occurred because gasoline vapors had accumulated in the living room (due to gasoline poured along a wall and a couch) at the time the fire was ignited.

"The police interviewed Vizcarra on May 17 at the University of California, San Diego Burn Center (burn center). At the outset of the interview, Vizcarra denied knowing anything about the murder. He also denied knowing how the fire started, claiming he had been moving boxes for some people or had been sleeping just before the explosion. Later in the interview, Vizcarra admitted he knew '[m]ore or less' what happened to Holcomb, but claimed he had only helped move the body. Eventually, Vizcarra admitted he had stomped or kicked Holcomb a couple of times, and helped wrap the body and move it to the garage. Vizcarra, however, claimed the three other men took Holcomb into the bedroom, started the beating, and stabbed

5

Holcomb. Vizcarra claimed he kicked or stomped Holcomb because he was afraid.

"Vizcarra also eventually admitted participating in the arson, including being present when the decision was made to burn Hedderson's house and pouring gasoline on the living room floor. Vizcarra claimed he did not try to light the gasoline and that the plan was to light the fire by shooting flares at the house. He believed someone had wanted him to die in the fire.

"On November 19, 2002, Hedderson, while in custody and in a holding cell waiting to testify in Vizcarra's case, became aware Vizcarra was in another holding cell. Vizcarra told Hedderson not to testify and said, 'If you do testify, don't say that I was there. Don't say you know me. Don't say I had anything to do with it.' Vizcarra also made a comment that Hedderson understood to mean that if Hedderson testified against Vizcarra, Hedderson would be killed in prison. Later that day, Hedderson had another conversation with Vizcarra in which Vizcarra again told Hedderson to testify Vizcarra was not involved in the murder or arson. Hedderson agreed because he was afraid. Subsequently, Hedderson called his sister and asked her to contact the district attorney's office about the threat."

(*Vizcarra I, supra*, D041824, footnotes omitted.)

The district attorney charged Vizcarra with Holcomb's murder and arson of an inhabited structure (§ 451, subd. (d)). It advanced alternative theories of murder liability, arguing: (1) he was liable for murder as a direct aider and abettor; and (2) he was liable for murder under the natural and probable consequences doctrine because he aided and abetted the commission of a target crime (assault by a deadly weapon or by means of force likely to produce great bodily injury) and murder was the natural and probable

6

consequence of the target crime.[3] Vizcarra was not prosecuted for murder under a felony-murder theory of liability.

After a trial, a jury acquitted Vizcarra of first degree murder, but found him guilty of second degree murder and arson of an inhabited structure. The trial court found true allegations that he had one prison prior (§§ 667.5, subd. (b), 668), two serious felony priors (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)), and two prior strikes within the meaning of the Three Strikes Law (§§ 667, subds. (b)–(i), 668, 1170.12), and sentenced him to an aggregate term of 60 years to life in state prison.

On direct appeal, our court affirmed the judgment of conviction. (*Vizcarra I, supra*, D041824.) The Supreme Court denied review.

B. *Resentencing Proceedings*

In 2019, Vizcarra filed a petition to vacate his murder conviction and to be resentenced. He averred he was entitled to resentencing because a charging document was filed against him permitting the prosecution to proceed under a theory of felony murder or the natural and probable consequences doctrine; at trial, he was convicted of murder under a theory of felony murder or the natural and probable consequences doctrine; and he

---

[3]    "[U]nder the natural and probable consequences doctrine, an accomplice is guilty not only of the offense he or she directly aided or abetted (i.e., the target offense), but also of any other offense committed by the direct perpetrator that was the 'natural and probable consequence' of the crime the accomplice aided and abetted (i.e., the nontarget offense)." (*People v. Gentile* (2020) 10 Cal.5th 830, 843 (*Gentile*).) "Unlike direct aiding and abetting liability, culpability under the natural and probable consequences theory does not require an accomplice to share the direct perpetrator's intent. Instead, '[a]ider and abettor culpability under the natural and probable consequences doctrine is vicarious in nature' and ' "is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense" ' may not be intended at all." (*Id.* at p. 844.)

7

could not now be convicted of murder based on recent legislative changes to sections 188 and 189 (i.e., our state's murder laws).

The trial court appointed counsel for Vizcarra, issued an order to show cause, and set the matter for an evidentiary hearing.

The district attorney filed a return in which she argued the trial court should deny Vizcarra's petition for resentencing because he directly aided and abetted implied malice murder—a still-valid theory of murder liability. At the evidentiary hearing, the court accepted the district attorney's argument, found Vizcarra was guilty of directly aiding and abetting implied malice murder, and denied the petition for resentencing.

## III

## DISCUSSION

### A. *Senate Bill 1437 and Senate Bill 775*

"In 2017, the Legislature adopted a concurrent resolution declaring a need to reform the state's homicide law 'to more equitably sentence offenders in accordance with their involvement in the crime.' [Citation.] The next year, the Legislature followed through with Senate Bill 1437, which made significant changes to the scope of murder liability for those who were neither the actual killers nor intended to kill anyone." (*People v. Strong* (2022) 13 Cal.5th 698, 707 (*Strong*).)

"To further that purpose, Senate Bill 1437 added three separate provisions to the Penal Code. First, to amend the felony murder rule, Senate Bill 1437 added section 189, subdivision (e): 'A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded,

8

induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2.' " (*Gentile, supra*, 10 Cal.5th at p. 842.)

"Second, to amend the natural and probable consequences doctrine, Senate Bill 1437 added section 188, subdivision (a)(3) … : 'Except [for felony murder liability] as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime.' " (*Gentile, supra*, 10 Cal.5th at pp. 842–843.) New section 188, subdivision (a)(3) precludes a conviction for "second degree murder under a theory that the defendant aided and abetted a crime, the natural and probable consequence of which was murder."[4]  (*Id.* at p. 843.)

Third, Senate Bill 1437 added a statutory provision that would later become section 1172.6, which established "a procedure for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief under the two ameliorative provisions above." (*Gentile, supra*, 10 Cal.5th at p. 843.)  "Under newly enacted section 1172.6, the process begins with the filing of a petition containing a declaration that all requirements for eligibility are met [citation], including that '[t]he petitioner could not presently be convicted of murder … because of changes to … Section 188 or 189 made effective January 1, 2019,' the effective date of Senate Bill 1437 [citation]." (*Strong, supra*, 13 Cal.5th at p. 708.)  "When the

---

4    Supreme Court precedent predating the enactment of Senate Bill 1437 already precluded a defendant from being found guilty of first degree premeditated murder under the natural and probable consequences doctrine. (*People v. Chiu* (2014) 59 Cal.4th 155, 158–159.)

trial court receives a petition containing the necessary declaration and other required information, the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' " (*Ibid.*) If the defendant makes "a prima facie showing of entitlement to relief, 'the court shall issue an order to show cause.' " (*Ibid.*) In general, the court must then "hold an evidentiary hearing at which the prosecution bears the burden of proving, 'beyond a reasonable doubt, that the petitioner is guilty of murder …' under state law as amended by Senate Bill 1437." (*Id.* at p. 709.)

While this appeal was pending, the Governor signed into law Senate Bill 775, which went into effect January 1, 2022. Prior to Senate Bill 775, only "persons convicted of murder under a felony murder or natural and probable consequences theory" could file a petition for resentencing. (Former § 1170.95, subd. (a).) Senate Bill 775 ostensibly broadened the pool of eligible petitioners by allowing a resentencing petition to be filed by any person "convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime."[5] (Former § 1170.95, subd. (a), as amended by Sen. Bill 775.)

B. *Aiding and Abetting Implied Malice Murder Is a Permissible Theory of Murder Liability*

Vizcarra's principal argument on appeal is that his petition for resentencing should be granted because aiding and abetting implied malice murder is not a valid theory of murder liability. We disagree.

"Murder, whether in the first or second degree, requires malice aforethought. (§ 187.) Malice can be express or implied. It is express when there is a manifest intent to kill (§ 188, subd. (a)(1)); it is implied if someone

[5]    Senate Bill 775 amended the resentencing process in several other ways not pertinent to this appeal.

10

kills with 'no considerable provocation ... or when the circumstances attending the killing show an abandoned and malignant heart' (§ 188, subd. (a)(2))." (*Gentile, supra*, 10 Cal.5th at p. 844.)

" 'The statutory definition of implied malice, a killing by one with an "abandoned and malignant heart" (§ 188), is far from clear in its meaning.' " (*People v. Superior Court of San Diego County* (2021) 73 Cal.App.5th 485, 500 (*Valenzuela*).) " 'Two lines of decisions developed, reflecting judicial attempts to "translate this amorphous anatomical characterization of implied malice into a tangible standard a jury can apply." ' " (*Ibid.*) One line of cases "state[s] that malice is implied when 'the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a *high ... probability* that it will result in death.' " (*Ibid.*) Another decisional line "states malice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*Ibid.*) "Under both tests, 'the ultimate inquiry involves a determination of probability: Although an act that will certainly lead to death is not required, the probability of death from the act must be more than remote or merely possible.' " (*Ibid.*; accord *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 104 ["the two definitions of implied malice ... articulated one and the same standard"].)

The district attorney prosecuted Vizcarra as an aider and abettor of Holcomb's murder. "All persons concerned in the commission of a crime ... whether they directly commit the act constituting the offense, or aid and abet in its commission ... are principals in any crime so committed." (§ 31; see *Valenzuela, supra*, 73 Cal.App.5th at p. 500 [" 'A person who aids and abets the commission of a crime is culpable as a principal in that crime.' "].) "When

11

a person directly perpetrates a killing, it is the perpetrator who must possess … malice. [Citations.] Similarly, when a person directly aids and abets a murder, the aider and abettor must possess malice aforethought." (*Gentile, supra*, 10 Cal.5th at pp. 844–845.) Therefore, "[g]uilt as an aider and abettor is guilt 'based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state.' " *People v. Powell* (2021) 63 Cal.App.5th 689, 710 (*Powell*); see *People v. Vaughn* (2022) 77 Cal.App.5th 609, 625 [" '[T]he aider/abettor's guilt is based on the combined acts of all the principals and on the aider/abettor's own knowledge and intent.' "].)

As noted, Vizcarra claims that the order denying his petition for resentencing must be reversed because aiding and abetting implied malice murder is not a legally-valid form of murder liability. He asserts: (1) an accomplice can be found guilty of aiding and abetting murder only if he or she specifically intends to kill the victim, yet (2) one who specifically intends to kill necessarily harbors express malice—not implied malice, which focuses on the "unintended result" of the perpetrator's conduct.

In *Powell, supra*, 63 Cal.App.5th 689, our colleagues from the Third District Court of Appeal rejected the argument Vizcarra raises here. As the *Powell* court explained, there "is no authority for the proposition that an aider and abettor of second degree implied malice murder must intend to kill." (*Id.* at p. 711.) Rather, "to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life." (*Id.* at p. 713.)

12

The *Powell* court drew support for this proposition from *Gentile, supra*, 10 Cal.5th at page 850. (*Powell, supra*, 63 Cal.App.5th at p. 713.) In *Gentile*, the Supreme Court determined that Senate Bill 1437 eliminated second degree murder convictions under the natural and probable consequences doctrine. (*Gentile,* at p. 848.) In reaching this conclusion, the Supreme Court reasoned that "[t]he natural and probable consequences doctrine [was] incompatible with [Senate Bill 1437] because an aider and abettor need not personally possess malice, express *or implied*, to be convicted of second degree murder under a natural and probable consequences theory." (*Gentile,* at p. 847, italics added.) According to the *Powell* court, "[t]his language clearly suggests an aider and abettor can be liable for implied malice murder as a theory independent of the natural and probable consequences doctrine." (*Powell,* at p. 713.)

Elsewhere in *Gentile*, the Supreme Court rejected an amicus curiae argument that natural and probable consequences murder should continue to be recognized as a valid form of murder liability, notwithstanding Senate Bill 1437; otherwise, certain criminal defendants who engage in dangerous conduct resulting in death might, in some factual circumstances, get " 'away with murder.' " (*Gentile, supra*, 10 Cal.5th at p. 850.) The Supreme Court tamped down these concerns, noting that prosecutors can still pursue murder convictions under a direct aiding and abetting theory, even without the natural and probable consequences doctrine. (*Ibid.*) It observed that, "notwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life." (*Ibid.*) Based in part

13

on these observations, the *Powell* court rejected the exact argument Vizcarra raises here—"that direct aiding and abetting implied malice murder is an invalid legal theory." (*Powell, supra*, 63 Cal.App.5th at p. 714.)

Vizcarra argues *Powell* is incorrect because it "simply repackage[s] natural and probable consequence murder," which is no longer a valid theory of liability. But we rejected this argument in *Valenzuela*, a case in which we "agree[d] with *Powell*'s analysis." (*Valenzuela, supra*, 73 Cal.App.5th at p. 499.) As we stated in *Valenzuela*, "*Powell* carefully explains that direct aiding and abetting of an implied malice murder is based on 'the aider and abettor's *own* mens rea.' … [T]he requisite intent 'must be *personally harbored* by the direct aider and abettor' and consists of 'knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life.' " (*Id.* at p. 499.) Thus, we determined that "*Powell* is entirely consistent with *Gentile* in basing murder liability on the aider and abettor's own state of mind—*conscious* disregard for life." (*Ibid.*; see also *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 590 (*Glukhoy*) [rejecting claim that aiding and abetting implied malice murder is merely a repackaged version of natural and probable consequences murder].) We reach the same conclusion here.

Vizcarra asks us to reject *Valenzuela* because it "fails to address" Senate Bill 775—namely, the new law's expansion of the pool of eligible resentencing petitioners to include any person convicted of murder pursuant to any "theory under which malice is imputed to [the] person based solely on that person's participation in a crime." (Former § 1170.95, subd. (a), as amended by Sen. Bill 775.) Senate Bill 775 does not undermine *Valenzuela*, nor does it affect our conclusion that direct aiding and abetting implied

14

malice murder remains a valid form of murder liability, because a person convicted of aiding and abetting implied malice murder is not a person convicted of murder pursuant to a theory under which malice is imputed based solely on the person's participation in a crime.

"[F]or second degree murder based on implied malice, there is no imputation of malice because, as we have explained, the direct aider and abettor must have the same mental state as the actual perpetrator of the charged crime: the direct aider and abettor must act with knowledge that *the act* is dangerous to human life and with conscious disregard for human life. Given the mens rea requirements for aiding and abetting implied malice, not only is malice not 'imputed' on this direct aiding and abetting theory, but liability is not grounded 'solely' upon participation in the crime …. Liability for murder is grounded upon the requirement that the aider and abettor personally harbor malice." (*Glukhoy, supra*, 77 Cal.App.5th at pp. 590–591; see also *id.* at p. 591 ["nothing in Senate Bill 775 or its legislative history indicates a rejection of our high court's observation concerning the availability of direct aiding and abetting implied malice murder as a theory of accomplice liability, nor is there any legislative history indicating disagreement with … *Powell*"].)

In short, we join the chorus of appellate authorities—from the Supreme Court, our own court, and other Courts of Appeal—which have uniformly upheld aiding and abetting implied malice murder as a viable form of murder liability, notwithstanding the legislative changes effectuated by Senate Bill 1437 and Senate Bill 775. (*Gentile, supra*, 10 Cal.5th at p. 850; *Glukhoy, supra*, 77 Cal.App.5th at pp. 589–591; *Valenzuela, supra*, 73 Cal.App.5th at p. 499; *Powell, supra*, 63 Cal.App.5th at pp. 706–714; see also *People v. Langi* (2022) 73 Cal.App.5th 972, 983 [citing approvingly to the mens rea standard

15

articulated in *Powell*]; *People v. Cortes* (2022) 75 Cal.App.5th 198, 205 ["the evidence presented and arguments made might support that [the defendant] aided and abetted a shooting and acted with *implied* malice—a theory of murder that is still valid"].)

In addition to arguing that aiding and abetting implied malice murder is not a valid theory of murder liability, Vizcarra claims that there was insufficient evidence to establish that he knew the direct perpetrator "was going to cut Holcomb's throat or kill him, and acted to assist the actual killer with that act." However, as just discussed, the prosecution was under no obligation to make such an evidentiary showing. Rather, to establish Vizcarra's guilt, it needed to prove that Vizcarra, by words or conduct, aided the commission of a life endangering act, knew the perpetrator intended to commit the act, intended to aid the perpetrator in the commission of the act, knew the act was dangerous to human life, and acted in conscious disregard for human life. (See *Powell, supra*, 63 Cal.App.5th at p. 713.)

Substantial evidence established these essential elements. (See *People v. Clements* (2022) 75 Cal.App.5th 276, 298, 301 [an appellate court reviews factual findings in a resentencing proceeding for substantial evidence, even if the trial court did not oversee the murder trial and issued its findings based on a "cold record"].) Indeed, the court had before it ample evidence that Vizcarra angrily stated he would "take care of" the victim; sought assistance from his brother-in-law, who appeared on the scene with confederates in tow; grabbed the victim by the neck and placed him in a chokehold; dragged him into a bedroom with his confederates; stomped on him as he lay dying on the floor; wrapped him in a rug as he clung to life; placed a bag over his head; and poured gasoline all over the home where the victim's body was found.

16

This evidence was sufficient to prove that Vizcarra aided the commission of a life-threatening act, knew of the perpetrator's intent, intended to aid the perpetrator, knew his conduct endangered Holcomb's life, and acted with conscious disregard for human life. Thus, the court properly found that Vizcarra aided and abetted implied malice murder—a finding that precluded Vizcarra from prevailing on his petition for resentencing.

C. *Senate Bill 1393 Does Not Apply Because the Judgment is Final*

When Vizcarra was originally sentenced, the sentencing laws in effect at the time required courts to enhance sentences imposed for serious felony convictions by five years for each qualifying prior serious felony conviction. (Former § 667, subd. (a)(1); former § 1385, subd. (b) [prohibiting a court from striking a prior serious felony enhancement under section 667].) Consistent with these laws, the sentencing court enhanced Vizcarra's sentence by ten years to account for his two serious felony priors.

"On September 30, 2018, the Governor signed Senate Bill [] 1393 (effective January 1, 2019), amending sections 667, subdivision (a) and 1385, subdivision (b) (Stats. 2018, ch. 1013, §§ 1, 2) to permit a trial court to exercise discretion to strike or dismiss prior serious felony enhancements 'in the furtherance of justice.' (§ 1385, subd. (b)(1), as amended by Stats. 2018, ch. 1013, § 2.)" (*People v. Morelos* (2022) 13 Cal.5th 722, 847.) Senate Bill 1393 applies retroactively to cases with non-final judgments. (*People v. Stamps* (2020) 9 Cal.5th 685, 699; *People v. Garcia* (2018) 28 Cal.App.5th 961, 973.)

Vizcarra's judgment became final long before the effective date of Senate Bill 1393. Still, he argues Senate Bill 1393 should apply to him because his judgment would no longer be final if the trial court were to grant his petition for resentencing and vacate his murder conviction.

17

As we have discussed, the trial court properly denied Vizcarra's petition for resentencing because he directly aided and abetted implied malice murder—a still-viable theory of murder liability.  Thus, Vizcarra's murder conviction stands and his judgment remains final.  Because Vizcarra's judgment is final, he is not entitled to the retroactive application of Senate Bill 1393.  (*People v. Alexander* (2020) 45 Cal.App.5th 341, 344–347 [Senate Bill 1393 does not apply retroactively to final judgments of conviction].)

IV

DISPOSITION

The order is affirmed.


McCONNELL, P. J.

WE CONCUR:


HUFFMAN, J.


IRION, J.